IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARRY P. STINESPRING, III and )
JANICE L. STINESPRING, )
)
    Plaintiffs, )
)
    v. ) No. 12 C 5866
)
FIDELITY NATIONAL FINANCIAL, INC., )
formerly known as CHICAGO TITLE )
CORPORATION, and CHICAGO TITLE )
INSURANCE COMPANY, )
)
    Defendant. )

MEMORANDUM OPINION AND ORDER GRANTING
CHICAGO TITLE'S RULE 12(B)(6) MOTION TO DISMISS [16]

JAMES F. HOLDERMAN, Chief Judge:

Before the court is a "Rule 12(b)(6) Motion to Dismiss" (Dkt. No. 16) filed by defendant Fidelity National Financial, Inc., formerly known as Chicago Title Corporation and Chicago Title Insurance Company ("Chicago Title"). For the reasons stated below, Chicago Title's motion is granted.

BACKGROUND

On July 25, 2012, plaintiffs Harry P. Stinespring, III and Janice L. Stinespring ("the Stinesprings") filed a complaint against Chicago Title for claims arising out of allegedly fraudulent transactions involving Costa Rican real estate. (Dkt. No. 1 ("Compl.").) The real estate transactions at issue were carried out by the Stinesprings' business partner, Manfred Pino Sbravatti ("Pino"), the CEO of Latinamerica Title Co. ("LATCO"). (*Id*. ¶¶ 4-5.) LATCO was the exclusive agent of Chicago Title in Costa Rica from 2006 through September 2010, the relevant

1

time period. (*Id*. ¶¶ 4-6, 10.) Pino, an attorney licensed to practice in Costa Rica, represented himself to the Stinesprings as an expert in real estate investments. (*Id*. ¶ 7.)

In 2005, the Stinesprings entered into a 50/50 partnership with Pino for purposes of investing in Costa Rican real estate. (*Id*. ¶ 7.) The name of their newly-formed partnership was "Inmobiliaria Tres Peniques." (*Id*. ¶¶ 20-21.) In 2006, Pino negotiated for and purchased the "Tambor and Tamarindo farms" in Costa Rica on behalf of the partnership. (*Id*. ¶ 8.) Pino represented to the Stinesprings that he and the Stinesprings would share the cost of the properties, which was purported to be over $2,170,000.00 for each partner. (*Id*.) In fact, Pino paid "no part of the purchase price" for either of the farms, and the Stinesprings paid more than the total purchase price. (*Id.* ¶ 18.) Pino kept the "overage" from these sales for himself. (*Id*.) Although Pino provided the Stinesprings with "numerous signed 'contracts' for the sale of the subject farms" during the duration of their partnership, each contract ultimately "fell through for reasons not fully explained." (*Id.* ¶ 25.)

In August 2007 and July 2010, unbeknownst to the Stinesprings, Pino caused liens to be placed on the Tambor and Tamarindo farms by falsely claiming that "the shareholders of the entities had met and unanimously approved certain borrowings and liens." (*Id.* ¶ 17; *see also* Pls.' Ex. E (including specific dates).)[1] Pino thereafter "stole[ ] the loan proceeds for his own uses and purposes." (Compl. ¶ 17.) Similarly, on June 1, 2010, Pino fraudulently took out a $130,000 mortgage on a condominium unit in San Antonio de Belen owned exclusively by the Stinesprings and "pocketed the proceeds." (*Id.* ¶ 26.) On August 5, 2010, Pino fraudulently transferred one of the farms—the "Tamarindo Property"—from Inmobiliaria Tres Peniques to an

---

[1] The court considers "documents attached to the complaint as part of the complaint itself." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010); *see also* Fed. R. Civ. P. 10(c).

entity named Fiduciaria Castro Garnier, S.A., again without the Stinesprings' knowledge or consent. (*Id.* ¶ 20; see also Pls.' Ex. E.)

LATCO was formed in 2006, with Pino as its Chief Executive Officer and Director. (Compl. ¶¶ 10, 5.) At that time, Chicago Title and LATCO entered into an exclusive agency agreement. (*Id.* ¶ 10.) With the knowledge and support of Chicago Title, LATCO held itself out as the exclusive agent of Chicago Title and used the Chicago Title logo in promotional materials and on LATCO signs. (*Id.* ¶ 6.)

The Stinesprings allege that after the formation of LATCO and until they discovered Pino's fraudulent actions, Pino continually assured the Stinesprings that they should not be concerned about the lack of evidence of a title for the properties purchased by the partnership, because Pino was backed by Chicago Title in an exclusive agency relationship. (*Id.* ¶ 11.) In May of 2009, at a meeting in Panama, the Stinesprings were told by "the International Officers" of Chicago Title that "Pino was the 'star' of the Chicago Title international agents and was a man of unquestioned integrity and skill." (*Id.* ¶ 12.)

The Stinesprings nevertheless requested from Pino a title commitment "on at least one of" the Tambor and Tamarindo farms as a means of providing "further assurances of his real estate investment." (*Id.* ¶ 13.) On September 9, 2010, Pino provided the Stinesprings with a fraudulent Chicago Title title commitment ("Chicago Title Commitment") for the Tamarindo Property. (*Id.* ¶ 14; *see also* Pls.' Ex. E (identifying the Tamarindo Property by survey number).) In reality, the Tamarindo Property had already been transferred to another entity in August 2010, as stated above. The Chicago Title Commitment commits that Chicago Title Costa Rica Ctcr, S.A., will issue its guaranty of title to the Tamarindo Property "upon payment of the premiums and charges therefore." (Pls.' Ex. B.) The amount of risk that the Chicago Title Commitment

purports to bind on behalf of Inmobiliaria Tres Peniques is $4,894,339.90. (*Id*. at Sch. A.) The Chicago Title Commitment is not signed, although it states that it is "to become valid when countersigned by an authorized signatory." (Pls.' Ex. B.) The Stinesprings do not allege that either they or Pino paid the referenced premiums and charges to Chicago Title for a guaranty of title to the Tamarindo Property.

Also during September 2010, the Stinesprings discovered that Pino, who was representing the Stinesprings' son in other real estate transactions in Costa Rica, had stolen the net proceeds of the sale of their son's property. (Compl. ¶ 15.) The Stinesprings then retained counsel in Costa Rica to "review the legal status of [their] real estate holdings" and discovered Pino's fraudulent activities, as described above. (*Id*. ¶ 16; *see also* ¶¶ 9, 17-18, 20-21, 26.)

The Stinesprings allege that "the relationship which [LATCO] and Pino had with Chicago Title as its exclusive agent with the issuance of the Chicago Title insurance commitment gave the Stinesprings the reasonable reassurance at that time that Pino's conduct and actions (later proven fraudulent) were approved and overseen by Chicago Title, as principal." (*Id*. ¶ 22.) The Stinesprings further allege that because Chicago Title claimed LATCO (and Pino) as its "exclusive agent," Pino was given a better "opportunity to commit" the fraudulent acts alleged in the Complaint. (*Id*. ¶¶ 22, 24, 26.) The Stinesprings seek monetary damages from Chicago Title under theories of liability based upon agency, or, in the alternative, negligent hiring and negligent retention. (Compl. at 4-5.)

## LEGAL STANDARD

When considering a 12(b)(6) motion to dismiss for failure to state a claim, the court must take all facts alleged in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). To state a claim for

relief, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs can also plead themselves out of court by pleading specific facts which show that they have no claim. *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). The reviewing court should ask itself if the plaintiffs have presented in their complaint a "story that holds together," and whether the events in the complaint could have happened. *Swanson v. Citibank*, 614 F.3d 400, 404 (7th Cir. 2010). In making this determination, the court is to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

ANALYSIS

1. Agency Claim

At the outset, the court addresses the scope of Pino's alleged agency. Despite the Complaint's repeated references to LATCO as "the Exclusive Agent of Chicago Title," (*see* Compl. ¶¶ 4, 6, 10, 11, 22, 24, 26), the Complaint contains no allegations specifically describing the nature of the alleged agency relationship between LATCO and Chicago Title, or the duties that LATCO was allegedly authorized to perform, through Pino, on behalf of Chicago Title.

The Stinesprings allege simply that, due to the principal-agent relationship between LATCO and Chicago Title, Chicago Title is liable for Pino's actions "done in the scope of its business." (Compl. ¶¶ 27-32.) Viewing the allegations of the Complaint in the light most favorable to the Stinesprings, as the court must at this stage of the litigation, the court

understands the Stinesprings to be alleging that Chicago Title is liable for all damages stemming from: (1) the August 2007 and July 2010 liens that Pino caused to be placed on the Tambor and Tamarindo farms; (2) the June 2010 lien that Pino caused to be placed on the Stinesprings' condominium; (3) the August 2010 transfer of the Tamarindo Property; and (4) the September 9, 2010 production of the fraudulent Chicago Title Commitment for the Tamarindo Property.[2]

Principles of agency dictate that a principal can be subject to liability for the tortious actions of its agent. *Restatement (Third) of Agency* §§ 7.04, 7.08 (2006). Although the Stinesprings allege in their Complaint that Chicago Title is liable under principles of agency for damages resulting from Pino's actions as its agent, they do not specifically identify the tort perpetrated by Pino for which Chicago Title is alleged to be liable. The court presumes for purposes of this analysis, when viewing the Complaint in the light most favorable to the plaintiffs, that the Stinesprings have based their allegations of agency liability on Pino's fraudulent misrepresentations.

An agent's authority from its principal "may be either actual or apparent, and actual authority may be either express or implied." *Zahl v. Krupa*, 850 N.E.2d 304, 311 (Ill. App. Ct. 2d Dist. 2006) (citing *Kaporovskiy v. Grecian Delight Foods, Inc.*, 787 N.E.2d 268, 272 (Ill. App. Ct. 1st Dist. 2003)). "Express authority is actual authority granted explicitly by the principal to the agent; implied authority is actual authority proved circumstantially by evidence of the agent's position." *Patrick Eng'ring, Inc. v. City of Naperville*, 976 N.E.2d 318, 329 (Ill. 2012). The court will discuss each type of agency authorization in turn.

---

[2] The Stinesprings do not allege that Chicago Title is liable for the "initial fraudulent acts by Pino" related to his purchase of the Tambor and Tamarindo farms on behalf of the partnership. (*See* Dkt. No. 19 (Pls.' Resp.") at 6.)

A.  Actual Authority

The Stinesprings do not allege or argue that LATCO and Pino were actually authorized by Chicago Title to place liens on Costa Rican properties or to purchase or sell Costa Rican properties. The court therefore limits its analysis of actual authority to Pino's production of the fraudulent Chicago Title Commitment for the Tamarindo Property on September 9, 2010. Together, the allegations of the Complaint and the language of the Agency Agreement between Chicago Title and LATCO demonstrate that Pino did not have actual authority to provide the fraudulent Chicago Title Commitment to the Stinesprings.[3]

Under the terms of the Agency Agreement, LATCO cannot commit Chicago Title to risks "without Chicago Title's prior written approval" where (1) the risk was over $500,000 or (2) "a partner, member, or shareholder of Agent . . . has or will have a legal or equitable interest" in the transaction. (Agency Agreement ¶¶ 7A, 7G and Sch. A.) Although both of these provisions apply to the Tamarindo Property, the Stinesprings have not alleged or argued that Chicago Title gave Pino written approval prior to his production of the Chicago Title Commitment. The Stinesprings also do not allege any facts plausibly suggesting that Chicago Title at any time implied through circumstantial evidence that Pino had actual authority to act as its agent beyond the scope of the Agency Agreement. Accordingly, the court concludes that the Stinesprings have failed to allege a plausible theory of liability on the grounds that Pino was actually authorized to produce a binding Chicago Title commitment for the Tamarindo Property.

---

[3] Documents attached to a defendant's motion to dismiss are properly before the court if they are referenced in the plaintiff's complaint and are integral to the plaintiff's claims. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). The agency agreement between Chicago Title and LATCO, attached as an exhibit to Chicago Title's motion, (*see* Dkt. No. 16-2 ("Gonzalez Aff."), Ex. A ("Agency Agreement")), is referenced in paragraph 10 of the Stinesprings' Complaint, and is integral to plaintiffs' claims because the Stinesprings allege agency liability through actual authority given to Pino by Chicago Title. Accordingly, the court may consider the Agency Agreement between LATCO and Chicago Title when analyzing the Stinesprings' agency claim.

B.     Apparent Authority

To prove apparent authority, the Stinesprings—as a "third person" to the alleged agency relationship—must ultimately show that:

> (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority.

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004) (quoting *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 183 (Ill. App. Ct. 2d Dist. 2001)).

As noted above, the Stinesprings appear to be asserting that Chicago Title is liable for four specific acts committed by its alleged agent, Pino. Three of these acts—the August 2007 and July 2010 liens that Pino caused to be placed on the Tambor and Tamarindo farms; the June 2010 lien that Pino caused to be placed on the Stinesprings' condominium; and the August 2010 transfer of the Tamarindo Property—occurred without the Stinesprings' knowledge. It is therefore not clear to the court how the Stinesprings are alleged to have relied on Pino's apparent agency to their detriment with respect to these three transactions, even if the Stinesprings justifiably believed "that Pino's conduct and actions (later proven fraudulent) were approved and overseen by Chicago Title" as a general matter. (Compl. ¶ 22.) The Complaint also does not suggest that any of the entities issuing the liens relied on Pino's apparent authority to act on behalf of Chicago Title. Rather, the Complaint alleges that Pino secured the fraudulent liens by misrepresenting himself as an authorized agent of Inmobiliaria Tres Peniques. (*See* Compl. ¶ 17 ("Pino falsely stated that the shareholders of the entities had met and unanimously approved certain borrowings and liens against the farms.").) The Stinesprings have generally alleged that Pino's status as the exclusive agent of Chicago Title gave him "the opportunity to commit these

8

fraudulent acts," because "Pino had relationships with these same lenders through Chicago Title." (Compl. ¶¶ 24, 26.) This allegation, without more, is not sufficient to state a plausible theory of liability against Chicago Title based on Pino's apparent authority to act on behalf of Chicago Title with respect to these three transactions. The remainder of the court's analysis therefore focuses solely on Pino's September 9, 2010 production of the fraudulent Chicago Title Commitment for the Tamarindo Property.

Considering LATCO's alleged use of the Chicago Title logo, with Chicago Title's permission, and the alleged oral representation by Chicago Title's International Officers to the Stinesprings that Pino was a "star" within the organization, the Stinesprings could have reasonably concluded that Pino was an agent of Chicago Title who was authorized to act on its behalf. Given the totality of the circumstances, however, the factual allegations of the Complaint do not plausibly suggest that the Stinesprings could have justifiably relied upon Pino's apparent authority to produce the Chicago Title Commitment *as a reasonable assurance of Pino's real estate dealings*. In other words, even assuming that Pino had apparent authority to produce the Chicago Title Commitment, the Stinesprings have failed to plausibly allege that their reliance on this production was either justifiable or detrimental.[4]

The Chicago Title Commitment states on its face that it would "become valid when countersigned by an authorized signatory." (Pls.' Ex. B.) The line designated for the "Authorized Signatory" remains blank, however, which should have been a "red flag" to the Stinesprings that

---

[4] The absence of detrimental reliance is also fatal to the Stinesprings' underlying claim of fraudulent misrepresentation. Under Illinois law, a claim for fraudulent misrepresentation requires:

> (1) [a] false statement of material fact[;] (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from that reliance.

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (quoting *Dloogatch v. Brincat*, 920 N.E.2d 1161, 1166 (Ill. App. Ct. 1st Dist. 2009)).

something was amiss. The Chicago Title Commitment also states that it would be effective "upon the payment of the premiums and charges therefore." (*Id.*) The Stinesprings have failed to allege any facts in the Complaint suggesting that they paid any premiums or charges in exchange for the Chicago Title Commitment. If the Stinesprings had read these limitations and noted the missing signature, they could not have reasonably considered the Chicago Title Commitment to be an effective indication of title insurance for the Tamarindo Property, especially given Mr. Stinesprings's experience as a licensed attorney.[5]

Furthermore, the facts pleaded in the Complaint suggest that the Stinesprings were or should have been suspicious of Pino's activity prior to even being supplied with the Chicago Title Commitment. The Stinesprings allege in their Complaint that "[t]hroughout the purported 'partnership relationship' between Stinesprings and Pino, Pino provided numerous signed 'contracts' for the sale of the subject farms. At the 'last minute' each contract fell through for reasons not fully explained." (Compl. ¶ 25.) The Stinesprings' own characterization of their business relationship with Pino indicates to the court that the Stinesprings should have already been wary of Pino's actions prior to and independent of receiving the Chicago Title Commitment, and, as a result, could not have justifiably relied on Pino's production of the unsigned September 9, 2010 Chicago Title Commitment as "further assurances of [their] real estate investment." (Compl. ¶ 13.)

Additionally, the Stinesprings have not plausibly alleged that they relied on Pino's apparent authority to their detriment. The Stinesprings argue in their response that "[i]f the Stinesprings had not been told by [Chicago Title] that Pino and his LATCO office were its 'star agents', and if Stinesprings had not been given the assurance of the title commitment, action

---

[5] The court takes judicial notice of the fact that Harry P. Stinespring, III has filed an attorney appearance form on behalf of himself and Janice L. Stinespring. (Dkt. No. 3.)

could have been taken earlier to limit the losses sustained by the Plaintiffs." (Pls.' Resp. at 6-7.) The only relevant "losses" identified in the Complaint with respect to the Tamarindo Property, however, are attributable to the June 2010 lien on the Tamarindo Property and the August 2010 transfer of the Tamarindo Property. As the Complaint notes, "both transactions occur[ed] *prior* to the date of the Chicago Title Commitment." (Compl. ¶ 20 (emphasis in original).) Pino's production of the unsigned September 9, 2010 Chicago Title Commitment could not have caused these injuries.

In sum, the Stinesprings have not plausibly alleged that Pino had actual or apparent authority under Illinois law by which Chicago Title can be held liable for Pino's fraudulent misrepresentations. The Stinesprings' claim for liability based on Chicago Title's agency relationship with LATCO is therefore dismissed with prejudice.

2. Negligent Hiring and Negligent Retention Claim

The Stinesprings also allege that Chicago Title is liable for negligently hiring and retaining Pino, and for the damages resulting therefrom.[6] Negligent hiring and negligent retention are tort claims. *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 557 (7th Cir. 1992). The Stinesprings acknowledge in their response to Chicago Title's motion to dismiss that these claims "require that a 'duty' exist to impose liability—as with any tort." (Pl.'s Resp. at 16.)

The Stinesprings contend that Chicago Title owed them a special duty of care "imposed by" the Agency Agreement. (Pls.' Resp. at 17.) Specifically, the Stinesprings note that the Agency Agreement required LATCO to appropriately maintain and track "all guaranties and other pre-numbered forms furnished by Principal," (Agency Agreement ¶ 4.E), and they assert

---

[6] In their response brief, the Stinesprings further allude to an un-pleaded claim for negligent supervision. (Pls.' Resp. at 15-17.)

that this requirement was established in part for the purpose of avoiding foreseeable harm to individuals, such as the Stinesprings, who are not customers of Chicago Title. (Pls.' Resp. at 16-17.)

The court need not decide whether Chicago Title owed the Stinesprings any special duty of care under the circumstances alleged in the Complaint. *Compare Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 885 (7th Cir. 1992) (finding no duty of care where plaintiff was not a customer of the defendant investment firm and held no account there) *with Malorney v. B & L Motor Freight, Inc.*, 496 N.E.2d 1086, 1088-89 (Ill. App. Ct. 1st Dist. 1986) (duty of care arose when defendant employer entrusted its employee driver with an instrumentality of the underlying crime). Even if Chicago Title did owe the Stinesprings a special duty of care, the Stinesprings have not pleaded sufficient facts to plausibly assert that they suffered injuries from any alleged breach of this duty. To support their claim for negligent hiring and retention, the Stinesprings must plausibly allege that Chicago Title's negligence proximately caused their injuries. *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998). As noted above, Pino's production of the unsigned September 9, 2010 Chicago Title Commitment did not cause any of the injuries claimed by the Stinesprings in this lawsuit, all of which took place prior to September 9, 2010. Accordingly, the Stinesprings' claim for negligent hiring and retention is dismissed with prejudice.

## CONCLUSION

For the reasons stated above, Chicago Title's "Rule 12(b)(6) Motion to Dismiss" (Dkt. No. 16) is granted and all claims are dismissed with prejudice. Civil case terminated.

ENTER:

/s/ James F. Holderman
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: April 15, 2013